AO 91 (Rev. 11/82)  **CRIMINAL COMPLAINT**  ORIGINAL

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br>FEREIDOUN CHAPARLI | DOCKET NO. | FILED<br>CLERK, U.S. DISTRICT COURT<br>OCT 11 2019<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY            DEPUTY |
|---|---|---|
| | MAGISTRATE'S CASE NO.<br>19 MJ 04346 | |

Complaint for violation of Title 18, United States Code, Section 1343

| NAME OF MAGISTRATE JUDGE<br>THE HONORABLE ALEXANDER F. MACKINNON | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|

| DATE OF OFFENSE<br>May 31, 2018 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

[18 U.S.C. § 1343]

On or about May 31, 2018 in Los Angeles County, within the Central District of California, and elsewhere, defendant FEREIDOUN CHAPARLI ("CHAPARLI"), knowingly and with intent to defraud, devised participated in, executed, and attempted to execute a scheme to defraud Woodside Credit Union ("Woodside") and Automobili Lamborghini as to material items, and to obtain credit for the purchase of a 2012 Lamborghini Aventador (the "Aventador") by means of materially false and fraudulent pretenses, representations, and promises, and the concealment of material facts, namely, by submitting a false income tax return in connection with the loan for the Aventador and providing false income information to the credit union and car dealership.  For the purpose of executing and attempting to execute the aforementioned scheme to defraud, CHAPARLI caused the transmission of a wire communication in interstate commerce, namely, the transmission of credit history data from Equifax in Atlanta, Georgia to Woodside in California.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>Daniel Andampour |
|---|---|
| | OFFICIAL TITLE<br>Special Agent – Federal Bureau of Investigation |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1) | DATE<br>October 11, 2019 |
|---|---|

(1) See Federal Rules of Criminal Procedure 3 and 54

AUSA William M. Rollins x7407   REC: Detention

## **AFFIDAVIT**

I, Daniel Andampour, being duly sworn, declare and state as follows:

### I.  **PURPOSE OF AFFIDAVIT**

1.    This affidavit is made in support of a criminal complaint and arrest warrant against FEREIDOUN CHAPARLI ("CHAPARLI") for a violation of 18 U.S.C. § 1343 (wire fraud).

2.    I also make this affidavit in support of an application for a warrant to search any digital devices, including laptops, tablets, and phones (each individually a "SUBJECT DEVICE" and collectively, the "SUBJECT DEVICES"), that CHAPARLI may have on his person or in his luggage at Los Angeles International Airport ("LAX") when he attempts to leave the United States for Turkey on October 11, 2019, as more fully described below and in Attachment A, which is hereby incorporated by reference.

3.    The requested search warrant seeks authorization to search the SUBJECT DEVICE and seize evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 1956(h) (Conspiracy to Engage in Money Laundering); 1349 (Conspiracy to Commit Wire Fraud and Bank Fraud); 1343 (Wire Fraud); 1956 (Money Laundering); 31 U.S.C. § 5324 (structuring); and 26 U.S.C. § 7206 (filing a false income tax return)  (collectively referred to as the "SUBJECT OFFENSES"), as more fully described in Attachment B, which is incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and

1

information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and part only, and all dates are approximate.

## II. BACKGROUND OF AFFIANT

5.    I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), and have been so employed since 2017. Prior to that, I was an FBI support staff member for three years.  I am a federal law enforcement officer who is engaged in enforcing criminal laws, specifically, assisting with the enforcement of 18 U.S.C. § 1343 (wire fraud), among other offenses.  I am a graduate of the FBI Academy in Quantico, Virginia, where I received formal and specialized training in federal laws and regulations relating to wire fraud, bank fraud, money laundering, aggravated identity theft, structuring, and other financial crimes.  I have also participated in the execution of search warrants that were issued to obtain evidence related to violations of federal criminal laws.  Through my training and experience and that of other more experienced agents, I have become familiar with a variety of means through which individuals and entities commit fraud using the wires in violation United States law.

2

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

6.   On May 31, 2018, CHAPARLI completed a loan application to purchase a Lamborghini at a car dealership in Calabasas, California for $268,000.  In connection with the loan application, CHAPARLI emailed the dealership a purported copy of his 2017 income tax return, which stated that his adjusted total business income was $359,271 and adjusted gross income was $346,573.

7.   The tax return that CHAPARLI submitted to the dealership and credit union was falsified.  Contrary to CHAPARLI's representations, the true 2017 income tax return that CHAPARLI filed with the Internal Revenue Service ("IRS") reflected only $18,000 in total business income and $16,728 in adjusted gross income.  Had the credit union known CHAPARLI's true reported income – or that CHAPARLI submitted a forged tax return in connection with his loan application – it would not have issued a loan to CHAPARLI for the purchase of the Lamborghini.

8.   In addition, during a border search of CHAPARLI when he returned to Los Angeles from Turkey on October 1, 2019, Customs and Border Protection ("CBP") Officers found a "bill of sale" in CHAPARLI's luggage indicating that CHAPARLI sold a Lamborghini to J.M. and W.M. nearly one year ago, on October 14, 2018.  However, CHAPARLI did not notify the credit union of the sale, has not paid off the loan, and is still the registered owner of the vehicle.  CHAPARLI told CBP officers that he plans

3

to leave the United States for Turkey permanently on October 11, 2018.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

### A.    The May 31, 2018 Loan Application for the Lamborghini

6.    Based on my conversations with employees of North Los Angeles Lamborghini and Woodside Credit Union, as well as my review of documents obtained from both businesses, I know the following:

a.    On or about May 31, 2018, CHAPARLI traveled to Lamborghini North Los Angeles and indicated that he wanted to purchase a 2012 Lamborghini Aventador.  CHAPARLI provided the dealership with his California driver's license in connection with the purchase.

b.    To obtain a loan for the car, CHAPARLI also completed a loan application with the dealership and Woodside Credit Union.  In the application, CHAPARLI wrote that he earned $30,000 per month as the Chief Executive Officer ("CEO") of Gomax, Inc. ("Gomax").  CHAPARLI also stated that he earned $4,380 per month in rental income.

c.    CHAPARLI signed a certification verifying that the "income entered on this Credit Application is accurate," and he agreed that the credit union could obtain a consumer credit report from the "consumer credit reporting agencies (credit bureaus)" in connection with his proposed transaction.

d.    In a documentation checklist, the credit union stated that a signed copy of income tax returns (among other

4

possible documents establishing income) might be required in
order to prove income and fund the loan.

**B.    CHAPARLI Emails a Falsified 2017 Tax Return to the Credit Union**

9.    Based on my review of an email that CHAPARLI sent to
an employee of the Lamborghini dealership, documents obtained
from Woodside Credit Union and the dealership, and conversations
with the dealership and credit union's employees, I know the
following:

a.    On May 30, 2018, CHAPARLI emailed a Lamborghini
employee and wrote, "Please see my personal tax return attached
here." CHAPARLI used the email account "f.chaparli@gmail.com"
to send the email to Lamborghini, and he apparently forwarded
the tax return from "Shamloo $ Co.," who used the email account
"info@shamloo.net" to email CHAPARLI.

b.    Attached to the email, CHAPARLI provided a
purported 2017 Form 1040 U.S. Individual Income Tax Return.[1] The
return stated that CHAPARLI's total business income was $359,271
and that his adjusted gross income for 2017 was $346,573.

c.    The Lamborghini employee transmitted CHAPARLI's
purported tax return to a Woodside employee via email.

d.    A credit analyst for Woodside wrote that CHAPARLI
was "approved to finance" with a $47,000 cash down payment. The
analyst wrote:  "First two pages of tax return @ 360k min agi as
stated."

---

[1] The purported return was filed jointly with CHAPARLI's
wife, F.F.

e.    Woodside Credit Union asked all three major credit reporting agencies (TransUnion, Equifax, Inc. ("Equifax"), and Experian) to analyze CHAPARLI's credit.

10. On October 11, 2019, I spoke to an employee of Equifax, Inc. ("Equifax"), which his headquartered in Atlanta, Georgia.  The employee confirmed that any time Equifax analyzes the private financial data of a consumer in connection with a credit check, Equifax uses an electronic database at the company's headquarters in Atlanta.

### C.    CHAPARLI's True 2017 Income Tax Return and Bank Records

11. Based on my review of CHAPARLI's true 2017 federal income tax return that he filed with the IRS, which I obtained pursuant to a court order, as well as CHAPARLI's personal bank account records for 2017 and 2018 and an analysis of those records prepared by an FBI financial analyst, I know the following:

a.    Contrary to the purported 2017 individual Form 1040 income tax return that CHAPARLI provided to the Lamborghini dealership, CHAPARLI in fact filed an individual Form 1040 income tax return with the IRS stating that his total business income in 2017 was $18,000 and adjusted gross income was $16,728.[2]  The return was signed and dated electronically by CHAPARLI and F.F. on March 16, 2018, two months before CHAPARLI emailed the fraudulent return to Lamborghini.  The true tax return was purportedly prepared by "Farhad Shamloo."

---

[2] The true income tax return was filed jointly with CHAPARLI's wife, F.F.

6

b.    In addition, according to CHAPARLI's personal checking account records at JP Morgan Chase Bank, N.A., CHAPARLI received approximately $635,481.71 in deposits during the 2017 tax year and withdrew approximately $634,084.11.[3]

c.    Notwithstanding CHAPARLI's representations in May of 2018 that he received $4,380 per month in rental income and $30,000 per month from Gomax, no monthly deposit into CHAPARLI's account in 2018 equaled the purported $4,380 as stated on CHAPARLI's loan application, and CHAPARLI only received a total of $39,820 in electronic fund transfers from Gomax in all of 2018 through the date of the loan application; no monthly deposit from Gomax equaled the $30,000 stated on the car loan application.[4]

12. On October 11, 2019, I spoke to an employee of Woodside Credit Union.  The employee told me that had Woodside known that CHAPARLI overstated his income by more than $100,000 or that CHAPARLI provided a false income tax return in connection with his loan application, Woodside never would have loaned CHAPARLI money to purchase the Lamborghini.

---

[3] Throughout 2017, CHAPARLI deposited a total of approximately $54,290 in cash into his personal checking account.  Of the 24 cash deposits CHAPARLI made that year, all of the deposits were under the $10,000 threshold that triggers a currency transaction reporting ("CTR") requirement.  Based on my training and experience, I know that such deposits are consistent with a pattern of "structuring," which criminals and criminal organizations often use to conceal an illicit source of income from law enforcement.

[4] Agents are still in the process of obtaining bank records for accounts held by Gomax.

**D.    CHAPARLI Tells CBP He Plans to Leave the United States**

13.  Based on my review of a CBP border interview report and my conversations with CBP officers who interviewed CHAPARLI and searched his luggage during a secondary screening at LAX on October 1, 2019, I know the following:

a.    CHAPARLI returned to the United States from Turkey on Polish Airlines Flight LO 21 from Istanbul via Warsaw.

b.    In CHAPARLI's luggage, CBP officers found a "bill of sale" stating that CHAPARLI sold a Lamborghini to J.M. and W.M. nearly one year ago, on October 14, 2018.[5] The bill of sale indicated that future payments of approximately $2,500 – roughly the same amount of the monthly payments for the loan on the Lamborghini purchased by CHAPARLI in May of 2018 – should be made to the same bank that held CHAPARLI's loan. However, based on my conversations with employees of Woodside Credit Union and review of DMV records, I know that CHAPARLI did not notify the credit union of the sale, has not paid off the entirety of the loan,[6] and is still the registered owner of the vehicle.

c.    CHAPARLI told CBP officers that he would be meeting his "litigation lawyer" regarding a property dispute in Palos Verdes.

_____

[5] CHAPARLI also claimed that he used an app called "Turo" in the United States, a car sharing company, to rent his owned and leased vehicles.

[6] Although the loan is apparently still being paid, agents have not yet identified the individual(s) making the payments; CHAPARLI's personal bank account records do not indicate that he is making the loan payments each month.

d.    CHAPARLI said that he intended to leave the
United States for Turkey permanently on October 11, 2019, after
he fixed a "business dispute" that he had with his partner.
Once CHAPARLI sold his property to his business partner in the
U.S., he told CBP he planned to start a new business and move to
Turkey.

## V.  RETENTION OF EVIDENCE, FRUITS, AND/OR INSTRUMENTAILITIES OF CRIMINAL ACTIVITY

### i.  Retention of Evidence on the SUBJECT DEVICES

14.  Based on my knowledge, training, and experience, and
through discussions with investigators experienced in similar
investigations, I know that:

a.    Individuals, including those involved in fraud
and financial-related crimes, commonly maintain records and
documents.  The records are necessary for the individual to
track their income and expenses, manage their cash flow and
assets, track their investments, pay their monthly bills, and
comply with certain federal and/or state laws.  Additionally,
individuals involved in fraud and financial-related crimes may
maintain records and documents pertaining to their criminal
activity and/or records and documents pertaining to the use and
disposition of proceeds obtained through the scheme.  For
example, tax records may reflect income obtained and expenses
incurred relating to their crimes.  Conversely, the failure to
report criminally derived income may also constitute evidence.

b.    As noted above, CHAPARLI and an employee of
Lamborghini exchanged at least one email containing the

fraudulent tax return CHAPARLI submitted in connection with his
loan application.  CHAPARLI also appeared to have received the
fraudulent return from "Shamloo," a possible coconspirator.
Such emails are often exchanged on digital devices.

c.   CHAPARLI and any as-yet unidentified co-
conspirators may have retained these types of records in order
to track their correspondence and involvement in fraud schemes.
In other words, having those records may have assisted CHAPARLI
and any as-yet unidentified coconspirators in tracking their
correspondence and the particular transactions related to each
fraudulent scheme, and the laundering of the proceeds of those
schemes.

d.   Individuals involved in fraud and financial-
related crimes often maintain records for a long period of time,
particularly when they are involved in ongoing criminal conduct
for the following reasons:

e.   To the offender, the evidence may seem innocuous
at first glance (e.g., financial, credit card and banking
documents, travel documents, receipts, documents reflecting
purchases of assets, personal calendars, telephone and address
directories, check books, video recordings and photographs,
utility records, ownership records, letters and notes, tax
returns and financial records, escrow files, telephone and pager
bills, keys to safe deposit boxes, packaging materials, computer
hardware and software).  However, to law enforcement, such items
may have significance and relevance when considered in light of
other evidence.

10

f.   The criminal offender may no longer realize they still possesses the evidence or may believe law enforcement could not obtain a search warrant to seize the evidence.  The criminal offender may also be under the mistaken belief that they have deleted, hidden, or further destroyed evidence, such as digital device-related evidence, which in fact the evidence may be retrievable by a trained computer forensic expert.

g.   Finally, I know that individuals who are engaged in fraud and/or money laundering as their primary or sole source of income are likely to continue to engage in that criminal conduct, absent an intervening factor, such as an arrest.  Even after contact with law enforcement, such criminal offenders often continue to engage in fraud and/or money laundering offenses.

ii.  <u>Existence of Evidence on Digital Devices</u>

15.  As referenced above, on May 30, 2018, CHAPARLI appeared to receive an email from "Shamloo" containing a fraudulent tax return.  CHAPARLI then forwarded the fraudulent return to an employee of Lamborghini.

16.  Based on my training and experience, and experience in this investigation, I know that text messages and other messages can remain on a digital device for years.  Oftentimes, whether such messages remain on a phone can depend on whether the individual using the phone has deleted the messages; if the individual has not deleted the messages or set messages to automatically delete, then the messages can remain on the phone indefinitely.  (The residence of forensic artifacts on digital

devices is discussed in more detail in Section VI.)  In
addition, when a messaging application account is activated on a
new digital device, some messaging applications can download
onto the new digital device earlier conversations associated
with the messaging application account conducted using other
digital devices.

17.  In addition to using their cell phones to send text
messages, based on my training and experience, I know that
individuals often exchange photographs related to fraudulent
wire transfers, photographs of themselves, audio messages
containing oral messages to other coconspirators, and video
messages depicting themselves.

18.  Email is also integral to many digital fraud scams, as
fraudsters often communicate through email with unwitting
victims while using false identities and personas.   Thus,
relevant information can be expected to be located on the
SUBJECT DEVICE, which could have been used for accessing email.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

19.  As used herein, the term "digital device" includes the
SUBJECT DEVICES.

20.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

e.  Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet.  Normally,

when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

       f.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

       g.  The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

h.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

21.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

c.    The forensic review of digital devices is time consuming.  Agents cannot simply turn on computers and review

their contents because merely turning on a computer and reviewing its contents changes the data on the computer. Specialized computer software is therefore needed to ensure that evidence remains in a pristine and usable condition, and is not affected by the review process.  The review also must be conducted by agents who have received specialized training to ensure that the review is done thoroughly and in a forensically sound fashion.  This process takes substantial time.

d.   The review of digital devices is anticipated to be time-consuming and resource-intensive.  In addition, it is possible that the SUBJECT DEVICES will be locked and inaccessible to the agents.  The government thus requests a period of 365 days to conduct its searches of the SUBJECT DEVICES.

22.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition

15

function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.     In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.     Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress CHAPARLI's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of CHAPARLI's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

## VII.  **REQUEST TO SEAL**

23.  I respectfully request the Court issue an order sealing, until further order of the Court, the search and seizure warrant being sought, the application for the warrant, and this affidavit submitted in support of the application for the warrant and the complaint.  The investigation currently being conducted is ongoing and includes investigation of fraud schemes and money laundering that was not previously charged with unknown, as-yet unidentified co-conspirators.  Premature disclosure of such information could jeopardize the continuing

investigative activities, and could result in the destruction of evidence.

### VIII.     <u>CONCLUSION</u>

24.  For all of the reasons described above, there is probable cause to believe that CHAPARLI has committed a violation of 18 U.S.C. § 1343 (wire fraud), and that the SUBJECT DEVICES will contain evidence of the SUBJECT OFFENSES.

Daniel Andampour
Special Agent
Federal Bureau of Investigation

Subscribed to and sworn before me
this _11-12_ day of October, 2019.

UNITED STATES MAGISTRATE JUDGE
ALEXANDER F. MacKINNON